**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| HAWA TURAY, DEBORAH BROWN, and WONDA THOMAS, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-09-0193 |
| | § | |
| HARRIS COUNTY, TEXAS, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON**
**MOTION FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #29). Pending before the court is a motion for summary judgment which was filed by Defendant Harris County, Texas ("Defendant," "Harris County"). (Defendant's Motion for Summary Judgment ["Motion"], Docket Entry #21). In that motion, Defendant seeks judgment in its favor on the employment discrimination claims made by Plaintiffs Hawa Turay ("Turay"), Deborah Brown ("Brown"), and Wonda Thomas ("Thomas") (collectively, "Plaintiffs"). Plaintiffs filed a response in opposition to that motion, and Defendant has replied. (Plaintiffs' Response to Defendant's Motion for Summary Judgment ["Response"], Docket Entry #24; Defendant's Reply to Plaintiffs' Response to Motion for Summary Judgment ["Reply"], Docket Entry #28). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Defendant's motion for summary judgment be GRANTED.

**Background**

All three plaintiffs to this action, Hawa Turay, Deborah Brown, and Wonda Thomas, were employed as registered or licensed vocational nurses by the Harris County Juvenile Probation Department ("HCJPD"). (Plaintiffs' First Amended Complaint ["Complaint"], Docket Entry # 15, at 2-3). HCJPD "provide[s] treatment, training, rehabilitation, and incarceration of juvenile delinquents while emphasizing responsibility and accountability of both parent and child for the child's conduct." (Motion at 6). HCJPD has five residential units, throughout the County, in which this treatment or incarceration takes place. (*Id*. at 6 and Exhibit ["Ex."] B). One residential unit, commonly known as "Detention," is a "pre-adjudication" facility, which houses children until a final judgment has been entered in their cases. (*Id*. at 6-7 and Ex. B). "Detention" has the highest population of the residential facilities. (*Id*. at 7 and Ex. B, C). This is so because it receives the most children, and because it is "the hub of all medical operations for HCJPD." (*Id*.). For these reasons, more medical personnel is needed at Detention than at any of the other HCJPD facilities. (*Id*. at Ex. C). The other HCJPD residential units are "post-adjudication facilities," which house children against whom the juvenile court has ruled. (*Id*. at 6-7 and Ex. B). These facilities include the Burnett Bayland Reception Center, the Burnett Bayland Home, the Harris County Youth Village, and the Delta 3 Boot Camp. (*Id*. at 7). Typically, children arrive at these post-adjudication facilities after they have been "cleaned up" and deemed physically and psychologically "stable." (*Id*. at 7 and Ex. C). While these facilities do provide some medical care, a child who develops the need for significant treatment will be returned to Detention or sent to a hospital. (*Id*. at 7-8 and Ex. B, C).

The County claims that the medical staffing needs at all of the residential facilities increased until, in 2005, HCJPD "had to resort to using temporary or 'model' positions and agency nurses

. . . to ensure adequate staffing."  (*Id*. at 8 and Ex. B).  In 2006, the head of HCJPD, Harvey Hetzel ("Hetzel"), decided that the department "would provide better health services to the juveniles through an integrated medical division with one clearly defined chain of command."  (*Id*. at 9 and Ex. B).  As a result, Hetzel obtained authority from the Commissioner's Court  "to create a Medical Services Division at HCJPD."  (*Id*.).  A "Medical Director" was to head the division, followed by a "Director of Nursing," and at least two "Nurse Supervisor[s]."  (*Id*.).  Candidates for the "Nurse Supervisor" position  must be registered nurses ("RN") with a minimum of seven years' nursing experience and two years' supervisory experience.  (*Id*.).  Nurse Supervisors in the newly created division were to be given "more administrative and managerial responsibilities than RNs and [licensed vocational nurses ("LVN")]."  (*Id*. at 9-10 and Ex. B).  Defendant maintains, however, that nurses other than "Nurse Supervisors" may still be called upon to supervise others, but to a lesser extent.  (Motion at 14-15).

When Hetzel created the Medical Services Division, a longtime employee, Mary Rundell ("Rundell"), was given the position of Nurse Supervisor at the Detention facility.  (*Id*. at 10).  At that time, Rundell, whom Plaintiffs describe as a "White/Asian female," had been working as a registered nurse and a supervisor at HCJPD for more than 22 years.  (*Id*. at 10 and Ex. B; Complaint at 5).  According to Plaintiffs, Rundell "had been in effect functioning in the position of a Nurse Supervisor at Detention for quite some time."  (Response at 10).  In fact, several years before her "promotion," HCJPD had increased Rundell's compensation because she acted as a "supervisor." (*Id*.).  At the time of the reorganization, Plaintiffs, who are all African-American, were employed as nurses in HCJPD's post-adjudication facilities.  (*Id*.).  Because their experiences differ, a brief consideration of each Plaintiff's background is appropriate.

3

*Hawa Turay*

On July 10, 2003, Turay, a newly licensed registered nurse, applied for a position with HCJPD. (Complaint at 2; Motion at 11 and Ex. B; Response at 4 and Ex. 1, 2). According to Turay, during the application process, she was told that the job opening was for a "Nurse Supervisor." (*Id*. at 5). In September 2003, she was given a position at the Burnett-Bayland Home, one of the post-adjudication facilities. (*Id*. at 4 and Ex. 4; Complaint at 3). On her first day of work, Turay signed an "Employee's Certification," which identified her as a "Nurse, Supervisor." (Response at 4 and Ex. 3). On the same day, she was given a "Job Description for Registered Nurse." (*Id*. at 5 and Ex. 11). In 2004 and 2005, Turay signed or received additional documents from HCJPD which referred to her position as "nurse supervisor." (*Id*. at 4-5 and Ex. 4, 5, 6, 7). On Turay's performance appraisals, her superiors completed those portions of the form reserved for "Supervisory Personnel Only." (*Id*. at 7 and Ex. 18-21). She claims that, given those representations, she believed that she was employed as a nurse supervisor. (*Id*. at 4-7). In 2006, however, Turay received employment-related documents that referred to her as an "RN," and which made no mention of her as a "supervisor." (*Id*. at 5 and Ex. 8-10). In June 2006, Turay applied for the position of "Director of Nursing," and she also applied for the "Nurse Supervisor" position at the post-adjudication facilities. (Motion at 11 and Ex. B). Turay was informed that she did not receive either position "because she had no experience as a supervisor." (Response at 5 and Ex. 10). On September 22, 2006, Turay initiated the HCJPD grievance process, complaining that she was not credited for her work as a supervisor, and that she had never been compensated appropriately for it. (Complaint at 4-5). Her grievance was unsuccessful. (*See id*.). To date, Turay remains employed by HCJPD. (*Id*. at 2).

4

*Wonda Thomas*

In June 2003, Thomas, an RN, was hired by HCJPD to work at the Burnett Bayland

Reception Center, also a post-adjudication facility.  (*Id.* at 2-3; Response at 8).  Thomas claims that,

during the job interview, she was informed that the opening was for a supervisor's position.  (*Id.* at

8 and Ex. 22, 23, 31).  When she began her employment, Thomas received documents which

identified her as an "Nurse R.N."  (*Id.*).  On September 1, 2005, and again on June 2, 2006, however,

she received personnel documents which identified her as an "Administrator."  (*Id.* at 8 and Ex. 25,

26).  In addition, her employee performance appraisals, dating from October 2003, through 2005,

identify her as a "Nurse, Supervisor."  (*Id.* at 8 and Ex. 27, 28, 29).  Thomas also claims that she

routinely performed the duties of a supervisor, including the following tasks:

> I conducted departmental meetings, with medical personnel, performed employee
> evaluations, signed employee time sheets, attended supervisors meetings, assisted
> with medical department's budget, and many other supervisory duties.

(*Id.* at 9 and Ex. 31).  Thomas claims that she was therefore surprised in 2006, when she received

a performance evaluation that referred to her as a "Nurse R.N."  (*Id.* at 8 and Ex. 30).  Like Turay,

Thomas initiated the grievance process in September 2006, seeking recognition and compensation

for her role as a supervisor.  (Complaint at 4-5).  She was terminated from HCJPD on May 31, 2007,

and she no longer works for the County.  (*Id.* at 3).

*Deborah Brown*

Brown's career at HCJPD began in November 1999, when she was hired as a licensed

vocational nurse for the Delta 3 Boot Camp, another post-adjudication facility.  (Complaint at 3;

Response at 11 and Ex. 34, 39, 41).  She claims that, as part of her job, she performed many

supervisory duties.  (Complaint at 3; Response at 11 and Ex. 41).  She explains,

> I did staffing, I did time sheets, I did scheduling, I disciplined employees, I had input on hiring and firing. . . .  I did staff training, I did medical staff training and non medical staff training.
>
> I went to supervisors['] meetings as a representative of the [Boot Camp] department. . . . I did performance appraisals -- performance evaluations --performance appraisal evaluations yearly.  I did a budget for the department and submitted it to my superintendent every year.

(*Id.*).   She also claims that "she was viewed as a supervisor and treated as same" throughout HCJPD.  (*Id.*).  In fact, in 2006, Brown received an employment evaluation that referred to her as a "Caseworker Supervisor."  (*Id.*).

Brown obtained her RN license in 2006.  (*Id.*).  She claims that HCJPD posted an opening for another Nurse Supervisor position after she became an RN.  (Complaint at 2).  Brown interviewed for that position, but she was not selected.  (*Id.*).  She claims that she was told that she was not qualified for the position because she lacked supervisory experience.  (Response at Ex. 41). While it is unclear whether Brown filed any grievance with HCJPD, she did make some form of complaint, which was ultimately considered along with the grievances filed by Turay and Thomas. (*Id.*).  On May 9, 2007, Brown resigned from HCJPD, and accepted a job with the Harris County Sheriff's Office.  (*Id.*).

Plaintiffs' grievances were first considered, and denied, by Diana Quintana ("Quintana"), Deputy Director for HCJPD.  (*Id.* at 4-5; Response at 6, 9 and Ex. 14, 33).  In her decision denying Turay's grievance, Quintana provided the following explanation:

> After giving careful consideration to your grievance request, I cannot support your request to change your job description/title to Nursing Supervisor, nor for the increased financial compensation associated with this title.

(*Id*. at 6 and Ex. 14).  Quintana acknowledged that Turay and Thomas each held "a leadership role" within HCJPD, but not one that "r[o]se to the level of the Nursing Supervisor."  (*Id*.).  She did find it appropriate, however, to place a letter in their personnel files, "acknowledge[ing] [their] leadership role within the agency."  (*Id*. at 6, 9 and Ex. 14, 33).  By doing so, Quintana believed that their work would be adequately recognized in the future.  (*Id*. at Ex. 33).  Dissatisfied with that decision, Turay and Thomas appealed to Hetzel, who informed them that they had never held a supervisor's position. (*Id*. at 7, 9 and Ex. 15).  Hetzel also told them that RNs with their level of experience often assume some supervisory duties, but that does not mean that they are "supervisors" within the medical division of HCJPD.  (*Id*. at 9).  Hetzel's decision was reviewed by HCJPD's Grievance Resolution Committee, which affirmed his findings, and denied the grievances.  (*Id*. at Ex. 16, 17; Complaint at 4).

In December 2006, Plaintiffs' grievances reached the Harris County Commissioner's Court. (*Id*. at 4-5).  As part of her appeal, Turay explained that she did not believe that a letter acknowledging her supervisory work was an adequate remedy:

> A Letter of Introduction is not an official description of the title and functions in which I performed by the instructions of my administration at Burnett-Bayland Home.  A change of status would accurately display the above in a justly manner. I appreciate the gesture; however, this resolution does not address my responsibility of the Medical dept.

(Response at Ex. 17).  Turay also asked the Commissioner's Court to "authorize compensation for the time served supervising the entire Medical Dept. at Burnett Bayland Home."  (*Id*.).  On March 13, 2007, while the grievances were still pending, the Harris County Attorney's Office sent a letter to the Commissioner's Court, recommending that it affirm the Grievance Committee's decision.  (*Id*. at Ex. 55).  The County Attorney reported that Plaintiffs were not entitled to extra compensation,

because they had performed only those duties expected of employees classified as RNs.  (*Id*.).  He

offered the following reasoning:

> the Texas Nursing Practice Standards require all nurses "to supervise the nursing care provided by others for whom the nurse is professionally responsible."  Thus, the Department expects every nurse in the institution to exercise that degree of "supervision" at all times.

(*Id*. [citation omitted]).  The County Attorney pointed out, as well, that Turay, Brown, and Thomas

were not qualified to be "Nurse Supervisors," as that position was defined in the 2006

reorganization.  (*Id*.).  He stated further that Texas law does not authorize an award of "any extra

compensation . . . after service has been rendered, or a contract has been entered into, and performed

in whole or in part."  (*Id*.).  Ultimately, the Commissioner's Court adopted the Harris County

Attorney's recommendation, and Plaintiffs were denied the relief they sought.  (Complaint at 4-5).

On January 27, 2009, Plaintiffs filed this employment discrimination lawsuit, complaining

that they were treated differently from similarly situated, non-African-American employees, in

violation of § 1981 and § 1983.[1]  (Complaint at 2).  On March 31, 2010, Defendant filed a motion

for summary judgment, arguing (i) that Plaintiffs' "§ 1981 claims fail because [they] have no

evidence of intentional discrimination" and (ii) that Plaintiffs' "§ 1983 claims fail because there is

no evidence of a policy or decision motivated by race discrimination and no evidence of a custom

resulting in a constitutional deprivation."  (Motion at 1).  In responding to Defendant's motion,

Plaintiffs argue that they have raised genuine issues of material fact on those issues.  (Response at

16-28).  They also emphasize that they are comparing themselves only to Rundell, who received the

Nurse Supervisor position at the pre-adjudication facility.  (*Id*. at 19).  Having reviewed the

---

[1] Plaintiffs state that they are not challenging Harris County's actions under Title VII, nor are they raising claims based on a failure to promote, but only for disparate treatment in violation of § 1981.  (Response at 3).

8

pleadings, the evidence, and the applicable law, the court recommends the entry of summary judgment in Defendant's favor.

**Standard of Review**

Summary judgment is appropriate when "'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 275-76 (5th Cir. 2010) (quoting FED. R. CIV. P. 56(c); *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009)). Under Rule 56(c), the moving party "bears the initial burden of 'informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The party moving for summary judgment "'must demonstrate the absence of a genuine issue of material fact,' but 'need not negate the elements of the non movant[s'] case.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *see Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movants' response. *See Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001); *Little*, 37 F.3d at 1075.

When the moving party has met its Rule 56 burden, the non-moving parties cannot merely rest on the allegations in their pleadings. *See Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349-50 (5th Cir. 2005); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.

1995).  Rather, the parties "must 'go beyond the pleadings'" and produce probative evidence to

show "'that there is a genuine issue for trial.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d

at 1075); citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 87 (1986));

*Izen Catalina*, 398 F.3d 363, 366 (5th Cir. 2005); *Taita Chem. Co.*, 246 F.3d at 385; *Hamilton v.*

*Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000); *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th

Cir. 1994).  If they do so, their evidence "is to be believed, and all justifiable inferences are to be

drawn in [their] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Taita Chem.*

*Co.*, 246 F.3d at 385.

**Discussion**

In this case, Plaintiffs allege that they were subjected to discrimination in violation of 42

U.S.C. § 1981, because they were purportedly denied the right to be identified and compensated as

supervisors, while Rundell, a similarly situated person, who is not African American, was awarded

such privileges.  (Complaint at 2).  Section 1981 provides that all persons shall have the same rights

as "white citizens" in "making, performance, modification, and termination of contracts, and the

enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C.

§ 1981(b); *accord CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 443 (2008); *Domino's Pizza, Inc.*

*v. McDonald*, 546 U.S. 470, 475 (2006); *Foley v. University of Houston Sys.*, 355 F.3d 333, 339 (5th

Cir. 2003); *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996).  One purpose of

this provision is "'to restore and strengthen civil rights laws that ban discrimination in

employment.'" *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1050 (5th Cir.

1998) (quoting H.R. REP. NO. 102-40(11), at 2 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 694)).

As a rule, § 1981 "serves as a deterrent to employment discrimination and a means of punishing

employers who discriminate on the basis of race," as well as "a means of compensating a victim of racial discrimination." *Carroll v. General Accident Ins. Co. of Am.*, 891 F.2d 1174, 1176 (5th Cir. 1990).   However, it is well settled that § 1981 applies only in those instances which involve intentional discrimination.   *See Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005).   Further, claims that a municipality violated § 1981 must be brought under § 1983.   *See Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 731-33 (1989); *Evans v. City of Houston*, 246 F.3d 344,  356 (5th Cir. 2001).   Section 1983 provides, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.  A violation of § 1983 occurs only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) (citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

In this case, to avoid summary judgment, Plaintiffs must demonstrate a genuine issue of material fact that Defendant discriminated against them because of their race.  *See Duvall v. Dallas County*, ___ F.3d ___, 2011 WL 106785, at *4 (5th Cir. Jan. 13, 2011).  To succeed on a race discrimination claim, "a plaintiff typically alleges that he 'received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'"  *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 212 (5th Cir. 2009) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)); *see Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d  296,  302  (5th Cir. 2000).  In *Lee  v. Kansas City Southern Railway Co.*, the  Fifth Circuit

11

provided the following guidance to courts in determining whether employees are "similarly situated":

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities . . . are not similarly situated. This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances." The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.

574 F.3d 253, 259-60 (5th Cir. 2009) (citations omitted); *see Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001); *Wyvill*, 212 F.3d at 302-05. Here, Plaintiffs base their discrimination claim on the differences between their treatment by HCJPD and the treatment afforded Mary Rundell. (Response at 18-19). Plaintiffs have not shown, however, that Rundell was similarly situated to any of them. First, by Plaintiffs' admission, HCJPD began to compensate Rundell for her supervisory work in 1999, long before they worked there. (*Id.* at 15-16). That employment action is simply "too remote in time from that taken against the plaintiff[s]" to show that the employees were "similarly situated." *See Lee*, 574 F.3d at 259 (citing *Wyvill*, 212 F.3d at 302). Next, it is undisputed that Rundell had significantly greater experience and better qualifications than Plaintiffs. (Motion at Ex. B). At the time of HCJPD's reorganization, Rundell had worked for the department for 22 years, always as a nurse, and for many years as a supervisor, while Plaintiffs had worked there far less time. (*Id.*). It is also clear that Rundell worked at a different HCJPD facility from any of the Plaintiffs, a fact that generally means that employees cannot be said to be similarly situated. *See Lee*, 574 F.3d at 259. Further, the evidence shows that there was a significant

difference in the work requirements at the pre-adjudication facility at which Rundell worked and the post-adjudication facilities in which Plaintiffs worked.  (*Id*. at Ex. A, B, C; Response at Ex. 58, 64). Defendant emphasizes that Detention was the most populated; that it was the first place children were brought; that it had children with the greatest number of needs; and that it was the "hub" of medical care for all of HCJPD.  (Motion at Ex. B).  Moreover, because Detention was the "hub" of medical care, Rundell would have encountered many more medical and personnel situations than nurses at the post-adjudication facilities.  (*Id*.).  Plaintiffs have not shown that, despite these obvious differences,  Rundell had nearly identical work responsibilities to theirs.  *See Lee*, 574 F.3d at 260 (citing *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990)).  In short, Plaintiffs seek to compare their treatment to that of an employee who worked in a different division, and who had far greater tenure and experience than any of them.  Such a comparison shows only, however, the "striking differences between the [employees'] situations," rather than the similarities required for a discrimination claim.  *See Wyvill*, 212 F.3d at 304-05.  As a result, summary judgment is appropriate on this ground.

Further, Plaintiffs seeking relief under § 1983 must show "that there was either an official policy or an unofficial custom, adopted by the municipality, that was the moving force behind the claimed constitutional violation."  *Duvall*, 2011 WL 106785, at *4 (citing *Monell*, 436 U.S. at 694); *see Cox*, 430 F.3d at 748-49 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).  The Fifth Circuit has held that, typically, an "official policy" is either one of the following:

1.    A policy statement, ordinance, regulation, or decision that is officially promulgated by the local governmental unit's law making officers or by an official to whom the lawmakers have delegated policy making authority;

or

2.      A persistent, widespread practice of local officials or local government employees, which although not authorized by officially adopted and promulgated policy is so common and well settled as to constitute a custom that fairly represents local government policy.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984); *see Cox*, 430 F.3d at 748; *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).  In a recent case, the Fifth Circuit held that a showing of official actions that "are 'sufficiently extended or pervasive . . . to prove an intended condition or practice'" is equivalent to a showing of the second consideration. *Duvall*, 2011 WL106785, at *2 (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996)).  On the other hand, isolated events are generally insufficient to be "'the persistent, often repeated constant violations that constitute custom and policy as required for municipal section 1983 liability.'" *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 437 (5th Cir. 2008) (quoting *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995)); *see Burge v. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).  Certainly, an isolated action does not suggest a "persistent, widespread practice." *See Webster*, 735 F.2d at 841.  Nor does it reveal actions that are "'extended or pervasive.'" *See Duvall*, 2011 WL106785, at *2 (quoting *Hare*, 74 F.3d at 645).  In an exception to this rule, a "single decision" by a policymaker may be found to constitute an official policy, but only under the "extremely narrow" circumstance that the decisionmaker was also a "final policymaker." *Bolton*, 541 F.3d at 548 (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)); *see Valle v. City of Houston*, 613 F.3d 536, 542, 548 (5th Cir. 2010) (citing *Bolton*, 541 F.3d at 548).

In this case, Plaintiffs claim that it was Defendant's policy, custom, or practice to give supervisory work to African American nurses, but not to compensate them for such work. (Response at 21).  They point to the County Attorney's statement that nurses should be expected to

perform supervisory work as part of their position without the expectation of additional compensation for it.  (*Id*. at Ex. 55).  They note, as well, that the County Attorney stated that Texas law does not allow "extra compensation" for work that has already been performed.  (*Id*.).  Plaintiffs argue that, overall, HCJPD's actions toward them, its attempted justification for those actions, and its decision to adopt the County Attorney's recommendation, are proof that a discriminatory "official policy" existed.  (*Id*.).   However, the evidence that Plaintiffs have presented shows only that a decision was made to deny their grievances, and that the offending decision was based on the facts and law particular to their own circumstances.  There is no evidence of a "persistent, widespread practice," or of "extended or pervasive [official actions]" that might show the existence of an "official policy."  *Duvall*, 2011 WL106785, at *2; *Webster*, 735 F.2d at 841.  Instead, the evidence reveals an isolated event in which HCJPD decided that Plaintiffs had never been supervisors, and that they could not be compensated for performing some supervisory tasks.  (*See* Response at Ex. 55).  As a rule, an isolated event will not be treated as "policy" for § 1983 purposes.  *See Gates*, 537 F.3d at 437; *Burge*, 336 F.3d at 370.  Generally, then, Plaintiffs would be unlikely to succeed on their § 1983 claim, even if a violation had been shown.

There is, however, an exception to the rule regarding isolated events.  *See Valle*, 613 F.3d at 548; *Bolton*, 541 F.3d at 548.  A single decision may constitute a policy, for purposes of § 1983, but only if that decision was made by a "final policymaker."  *Id*.; *see Valle*, 613 F.3d at 548.  A final policymaker "is someone who has 'the responsibility for making law or setting policy in any given area of a local government's business.'"  *Id*. (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988)).  To determine whether an official is a "final policymaker," a court must "'identify those officials or governmental bodies who speak with final policymaking authority for the local

governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.' " *Bolton*, 541 F.3d at 548 (quoting *McMillian v. Monroe County*, 520 U.S. 781, 784-85 (1997)). Further, a "final policymaker" is not the same as a "final decisionmaker." *Id*. at 548-49. In *Pembaur v. City of Cincinnati*, the United States Supreme Court illustrated that distinction in the following manner:

> [F]or example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

475 U.S. 469, 483 n.12 (1986); *see Praprotnik*, 485 U.S. at 129-30; *Bolton*, 541 F.3d at 549 n.3. "The finality of an official's action does not therefore automatically lend it the character of a policy." *Id*. at 550. In this case, Plaintiffs have not made clear whether the decision to deny their grievances was made by a "final policymaker." *See id*. at 548-50. What is clear, however, is that the complained of "policy" either is, or has its roots in, the letter sent by the Harris County Attorney's Office to the Commissioner's Court. (Response at 16-17 and Ex. 55). Or, more specifically, the recommendation that the Commissioner's Court adopt the Grievance Committee's findings against Plaintiffs. (*Id*.). Plaintiffs complain that the Harris County Commissioners' Court "accepted the advice of the County Attorneys and ruled that it was the policy of the County and contrary to Texas law to accord back wages." (Complaint at 4-5; *see* Response at 13 and Ex. 56).

16

However, Plaintiffs have submitted evidence that HCJPD is not bound by the rulings of the Commissioner's Court. (*Id*. at 13 and Ex. 35).  In particular, Hetzel testified at deposition that, while "members of the Juvenile Probation are Harris County employees," the "Commissioner's Court has no direction over its Board." (*Id*.).  He explained "that if the Commissioner's Court disagrees with the policy of the Juvenile Board, it could not direct the Juvenile Board to change policies." (*Id*.).  Plaintiffs also cite Hetzel's belief that "the Commissioner's Court cannot grant relief, 'it goes back to the independence of the Board.'" (*Id*. at 14 and Ex. 35).  It appears, then, that Plaintiffs believe that the policymaker is the HCJPD Board.  Hetzel testified, however, that HCJPD adopts Harris County's policies "[w]ith regard to employment procedures, the Juvenile Board has adopted Harris County's policies." (*Id*. at 14-15).  So, while Plaintiffs may have raised an issue on HCJPD's status as a policymaker, they have not shown that it was the "final policymaker" in this instance.  *See Pembaur*, 475 U.S. at 483 n.12.  Absent such a showing, Plaintiffs cannot show that their treatment by HCJPD was based on an official policy, a custom, or a practice, as required by § 1983.  (*See* Reply at 2-3).  Consequently, summary judgment is warranted in Defendant's favor on this ground, as well.

    In sum, Plaintiffs have raised no genuine issue of material fact on whether they were wrongfully denied the title, recognition, or equivalent compensation of a supervisor because of their race.  They have also shown no genuine issues of material fact regarding critical elements of their § 1983 case, namely, the existence of an "official policy" that was the motivating force behind the alleged discrimination.  *See Cox*, 430 F.3d at 748-49.  Instead, at best, the evidence suggests that there may have been "confusion, miscommunication, and mismanagement at HCJPD," which led to Plaintiffs' eventual disappointment that they were not named "Nurse Supervisors." (*See* Reply

17

at 2). Such matters, however, do not give rise to a claim under § 1981 and § 1983. For these reasons, judgment should be granted in Harris County's favor.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Harris County's motion for summary judgment be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 17th day of February, 2011.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**